**Opinion issued April 2, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-21-00593-CV

_____

**JEREMY SOUDERS, Appellant**

**V.**

**EXXON MOBIL CORPORATION, Appellee**

---

**On Appeal from the 80th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-51413**

---

## MEMORANDUM OPINION

Jeremy Souders sought damages from Exxon Mobil Corporation for personal injuries he sustained while working at Exxon's Baytown facility. During a routine crane lift, Souders was pinned between two 30,000-pound heat exchanger bundles and suffered extensive injuries. A jury awarded Souders $60,000 in damages for past

loss of earning capacity. Both Souders and Exxon appealed. For the reasons discussed below, we reverse the trial court's judgment and render a take-nothing judgment in favor of Exxon.

## BACKGROUND

### Exxon's Baytown Facility and the Turnaround

Souders's accident occurred while he was working at Exxon's Baytown oil refining facility during a "turnaround." A turnaround is when Exxon shuts down parts of the facility for major maintenance. Exxon hired JV Industrial Companies, or JVIC, as an independent contractor to perform crane and rigging operations for the turnaround. Souders was a JVIC employee and a certified advanced rigger.

During this turnaround, Exxon shut down and was repairing its flexicoker unit. The flexicoker unit refines crude oil by converting it to lighter materials like gasoline, diesel, and low butane gas. Inside the flexicoker unit are heat exchanger bundles that transfer heat for either heating or cooling the oil. A heat exchanger bundle is a 30,000-pound cylinder made of metal coils. Generally, during the turnaround, the bundles were removed from the flexicoker unit, moved to an open staging area called the 152 yard, and then moved to another open area called the wash slab for high-pressure cleaning.

Exxon requires crane operators and riggers who work for its independent contractors to be nationally certified in crane operation and rigging, respectively.

2

These certifications mean the crane and rigging crews already have the qualifications and skills to perform crane lifts before working at Exxon's facilities. Exxon also requires site-specific safety training. Exxon's safety guidelines do not train independent contractors on how to operate cranes or rig loads for lifting but are meant to reinforce safety guidelines the contractors already know as well as add site-specific rules.

One set of Exxon's site-specific safety guidelines is MWP 9080.[1] MWP 9080 establishes minimum safety guidelines for crane lifts and provides a framework for performing crane lifts safely. For instance, MWP 9080 requires a crew, before performing a crane lift, to complete a lift plan checklist and to identify exclusion zones. An exclusion zone is basically a zone of danger around a lift—it includes areas around the load being lifted where a person could be struck or crushed by the load. MWP 9080 also requires each crew to identify a lift director before each lift. The lift director is a member of the crew who is responsible for making sure the lift plan checklist is properly filled out before the lift, leading a pre-lift briefing to review the lift plan checklist with the crew, and ensuring that the exclusion zones are established and effectively managed.

MWP 9080 defines basic and complex crane lifts. A basic lift is any lift that does not meet the definition of a complex lift. A complex lift is defined to include

---

[1]     MWP stands for "maintenance work practice."

several types of lifts, like a lift using nonstandard rigging practices or special equipment, a lift using 80% of the crane's capacity, a lift weighing more than 50 tons, or a lift using two cranes. An Exxon site lift specialist must sign off on a complex lift before an independent contractor crew can perform the lift.

When Souders was injured, Exxon was also in the process of implementing a new set of site-specific safety guidelines, Tier 1 Best Practices or T1BP. Several months earlier, an employee of an independent contractor was injured during a crane lift—because the independent contractor was called Jacobs, this was known as the Jacobs incident. As a result of the Jacobs incident, Exxon decided to implement T1BP to improve safety among its contractors. By the time of Souders's injury, some contractors, like Souders, had received T1BP training, but others had not because Exxon was still in the process of training all its contractors.

Like MWP 9080, T1BP also defines minimum safety requirements to prevent injury during crane and rigging activities. T1BP generally requires crew members to actively participate in pre-lift briefing, know the boundaries of the exclusion zones, understand the items in lift plan checklists discussed during pre-lift briefing, and sign the checklists. T1BP also requires that each lift have a lift director, and it requires the lift director ensure that all lift plan checklists have been completed and that all crew members participate in a pre-lift briefing that covers the plan for managing exclusion zones.

Exxon's safety guidelines like T1BP and MWP 9080 are only meant to reinforce safety practices the crane and rigging crews should already know; Exxon does not provide comprehensive training for crane rigging and operating. Neither MWP 9080 nor T1BP explain how to perform crane and rigging operations. Independent contractors, like JVIC, are responsible for the training and qualifications of their crews.

When Souders was injured, Exxon knew that not all contractors had completed T1BP training and that some of Exxon's supervisors were not yet knowledgeable about T1BP. After the Jacobs incident, Exxon conducted a T1BP audit and found:

> • Observations have indicated site rigging groups with gaps in their execution of the new Tier 1[;]

> • Implementation has been taught in classroom setting and minimum field verification has been performed[;]

> • Majority of the review process has taken place in the form of desktop review of completed paperwork and in field only when clarification required it[;]

> • Lack of site Mechanical [supervisor]s being trained on the Tier 1 BP has [led] to a lack of knowledgeable oversight in the field[; and]

> • Left unchecked, this lack of knowledge and oversight could provide an opening for a serious incident[.]

### The Accident

On May 1, 2018, Souders and his JVIC crew were working the night shift. His crew included Harold Bird, the crane operator, and Richard Hubbell and Raul Ortiz,

5

two riggers like Souders. Each member of the crew had NCCCO or NCCER certifications. The crew was experienced: Bird had over 35 years' experience, and the two other riggers each had more than 15 years' experience and were certified riggers. Souders himself had been a certified rigger for more than five years and had gone through T1BP training. Souders, however, was the only member who had received T1BP training.

Souders's crew started in the wash slab that evening, the open space where equipment was cleaned.

Gerald Adams, Exxon's acting supervisor over the 152 yard, was supervising a crane disassembly in another part of the facility and was not supervising Souders's crew that night. After Adams spoke with Hubbell, he understood the crew would be moving a crane out of the way in the wash slab, but Adams testified he did not know they were going to perform a lift that night. They received their assignments from JVIC, not Exxon.

James Laramore was Exxon's step-up supervisor over the wash slab. He testified that he did not have anything to do with crane and rigging operations, except that when crane and rigging crews were in his area—the wash slab—he would have a safety talk with them. In his words, he would "go have a safety talk with them to . . . make sure they understand what they're doing, that they're clear on it and they don't have any questions and that I don't need to contact their supervisor."

6

Generally, in a safety meeting, he would ask the crew if they had any safety concerns, what would be the worst thing that could happen, and how they could mitigate the dangers. He was not familiar with MWP 9080 or T1BP. On the night of May 1, he had a conversation with the JVIC crew to discuss moving a clean heat exchanger bundle out of the wash slab to the 152 yard. He also discussed with the crew moving a bundle from the 152 yard to the wash slab. He did not cover MWP 9080 or T1BP with them, nor did he discuss exclusion zones.

The crew performed the first crane lift, at the wash slab, without incident. Souders was a rigger and the signal person for that lift.

The crew arrived at the 152 yard shortly before midnight. They were assigned to rig and lift a heat exchanger bundle from the 152 yard onto a truck so it could be transferred to the wash slab. Undisputedly, no one from Exxon was in the 152 yard that night. Several heat exchanger bundles were already laid out, or staged, in the 152 yard. The bundles were staged only two feet apart from each other. Although JVIC crews decided where to place them, they had to do so within the space provided by Exxon, which was the 152 yard.

There is evidence that the JVIC crew filled out a lift plan checklist.[2] The checklist was provided by Exxon as part of MWP 9080 and required for all lifts. The

---

[2]    There is also evidence to the contrary. Exxon's investigator concluded the crew did not complete a lift plan, but Exxon introduced a completed lift plan checklist signed by Souders's crew for a lift in the 152 yard on May 1, 2018. Souders testified that

purpose of the checklist was to make sure the crew considered all aspects of the lift before performing it. The lift plan checklist required the crew to fill out information like the weight of the load to be lifted, the working radius of the lifting equipment, and the means by which the signal person would communicate with the crane operator. On the lift plan checklist the JVIC crew filled out, the space for "Lift Director" was left blank. All four members of the JVIC crew signed the checklist. No one from Exxon was involved in the lift or reviewed the lift plan checklist.

For this lift in the 152 yard, Hubbell was assigned the task of signal person, and Ortiz and Souders were going to be riggers. Bird was the crane operator. The crew had a pre-lift briefing in the 152 yard but did not discuss exclusion zones during that meeting.

To rig the heat exchanger bundle the crew intended to move, Souders had to stand between two bundles. Once the bundle was rigged, Bird, the crane operator, began to lift the bundle—not off the ground, but only to take the slack out of the line, or, in other words, to create tension in the line. Souders testified that the riggers needed to hold the straps in place until there was tension. Once tension was established, though, Bird was supposed to stop lifting and allow the riggers to leave the area before the bundle was actually lifted off the ground. He should have waited

---

the crew filled out a lift plan checklist for the lift in the 152 yard. Exxon's investigator testified that the crew filled out a lift plan checklist for the earlier lift at the wash slab but not the lift at the 152 yard.

8

to receive the all-clear signal from the signal person before beginning the lift. On the night of May 1, however, as Souders was leaving the area but still in between two bundles, Bird began the lift. The bundle was lifted off the ground and swung toward Souders, pinning him between another bundle. Souders suffered extensive injuries to his lower body, including a compound leg fracture and pelvic fractures.

### The Aftermath

After Souders's accident, Exxon brought in Carolyn Ryeczek to conduct an investigation. Ryeczek is an Exxon supervisor but not involved with the flexicoker unit where the turnaround was occurring. In her investigation, she identified multiple causes of the accident. The crew failed to manage the exclusion zone and did not identify a lift director, two guidelines that were in JVIC's own procedures, MWP 9080, and T1BP. She also concluded that the crew did not complete a lift plan, a requirement in both MWP 9080 and T1BP. Additionally, Bird began the lift before he received the signal that the exclusion zone was clear. Lastly, Ryeczek noted the bundle was "overboomed," meaning the cable holding the bundle was not centered, which allowed it to swing.

Adams, Exxon's supervisor over the 152 yard who was not present during the accident, testified that an advanced rigger like Souders should have known not to stand in an exclusion zone and that a crane operator is not supposed to start moving a load before the signal person tells him to do so. Adams said a certified crane

9

operator and certified riggers should have been able to perform a basic lift like this safely.

Greg Perkin, Souders's safety expert who testified at trial, took a different view of the accident. Although he generally agreed that failure to identify a lift director, failure to complete a lift plan, and failure to manage the exclusion zones were causes of the accident, he also testified that Exxon's failures led to the accident.

First, Perkin said that Exxon knew its independent contractors were not adequately trained on Exxon's rules, like T1BP. He explained in general terms that if contractors are not knowledgeable on T1BP, they could deviate from the best practices and create hazards that way. He also explained that if Exxon chose to implement rules like T1BP, then Exxon also had a responsibility to train its contractors and make sure they understood how to follow the rules. He said that Exxon knew it had "some holes" in implementing T1BP because it knew both contractors and Exxon supervisors lacked T1BP training and knowledge, referencing Exxon's T1BP audit. This lack of knowledge combined with a lack of adequate supervision could lead to contractors doing things quickly instead of doing them safely, which could lead to injury. He thought Exxon should have known that its contractors were not following its rules.

Second, Perkin testified that this was a complex lift, not a basic lift. The lift involved a heat exchanger bundle that was "oblong, full of coils," and the crew could

10

not, before it was lifted, "know where the center of gravity is" or "how it's going to behave." That made the lift complex, despite MWP 9080's definition of a complex lift. He acknowledged that MWP 9080 defines basic and complex lifts, and he seemed to agree that the lift did not specifically meet MWP 9080's definition of a complex lift. But, he explained, "[W]hen a basic lift has hazards associated with it that are not necessarily identified or known, it doesn't become a basic lift anymore." In Perkin's opinion, defining a lift like this one to be a basic lift as Exxon did was harmful to the crew, because it made the crew believe the lift was less complicated than it actually was and made them work unsafely.

Third, Exxon provided inadequate space because the 152 yard was too small, and this was a root cause of the accident. Because Exxon did not allocate enough space, JVIC had to place the heat exchanger bundles too close together, which was "problematic." The inadequate space created "minus sight issues" and "potential pinch points." He also testified that Exxon provided insufficient lighting in the 152 yard, based on pictures and witness statements he reviewed.

Perkin agreed that each crewmember had the national certifications Exxon required, meaning they had the skills to perform this crane lift safely. Perkin agreed the crew did not need Exxon to tell them not to start the lift when someone was standing in between bundles. He agreed that, based on their training, experience, and skill set, the crew should have known not to start the lift before Souders was out of

11

the exclusion zone, and, among other things, that the accident happened because the lift began while Souders was still in the zone of danger.

## Legal Proceedings

Souders sued Exxon for negligence, negligence per se, and gross negligence. After a jury trial, the jury found that Exxon was negligent and attributed 30 percent of the responsibility for Souders's injury to Exxon.[3] The jury awarded Souders $60,000 for his past loss of earning capacity but awarded no other damages. The trial court entered judgment in accordance with the jury verdict.

Both Souders and Exxon appealed. In one issue, Souders argues the judgment should be reversed and the case remanded for a new trial because the jury's zero-dollar findings for loss of future earning capacity, past and future physical pain, past and future mental anguish, past and future physical impairment, and past and future disfigurement were irreconcilably inconsistent with the evidence of damages. Exxon raises three issues: (1) there was no evidence to support a finding of negligence; (2) the trial court improperly excluded certain evidence; and (3) there was error in the jury charge that probably caused the rendition of an improper judgment.

## DISCUSSION

Because it is dispositive of the outcome of this appeal, we consider only Exxon's first issue, that there was no evidence to support a finding of negligence.

---

[3] The jury attributed 20 percent to JVIC and 50 percent to Souders.

Specifically, Exxon argues there is no evidence to support the trial court's conclusion that Exxon owed any duty to Souders and no evidence to support the jury's findings of breach of duty or proximate cause. We agree that Exxon did not owe a duty and must reverse and render a take-nothing judgment in favor of Exxon.

**Applicable Law**

To establish liability on a negligence claim, a plaintiff must show: (1) the defendant owed a legal duty; (2) the defendant breached that duty; and (3) the breach proximately caused the plaintiff's damages. *Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022). The existence of a legal duty is a "threshold inquiry" and a "question of law for the court to decide from the facts surrounding the occurrence in question." *Id.* at 144–45 (quoting *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)).

Under the common law, a property owner does not owe a duty to ensure an independent contractor performs work on the property in a safe manner. *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 511 (Tex. 2022). Thus, "the owner generally is not liable for dangerous conditions or activities 'arising out of the independent contractor's work.'" *Id.* (quoting *Clayton W. Williams, Inc. v. Olivo*, 952 S.W.2d 523, 528 (Tex. 1997)). There is an exception when the owner exercises some control over the work and either knows or should have known of the danger. *Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 561 (Tex. 2016). In that case, the owner "'can be

13

liable for negligence in exercising or failing to exercise control over the part of the independent contractor's work that created the dangerous condition' or constituted [a] negligent activity." *Energen*, 642 S.W.3d at 511 (quoting *Olivo*, 952 S.W.2d at 528).

Chapter 95 of the Texas Civil Practice and Remedies Code adopted the common law but narrowed the property owner's liability even further. *Id.* at 511 n.6. When Chapter 95 applies,[4] the property owner owes no duty and is not liable for personal injury, death, or property damage unless:

> (1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and

> (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

---

[4] Chapter 95 applies to a claim:

> (1) against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or subcontractor; and

> (2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.

TEX. CIV. PRAC. & REM. CODE § 95.002. Chapter 95 applies to both premises-liability and negligent-activity claims. *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 43–44 (Tex. 2015). Souders has not disputed that Chapter 95 applies to his claims.

TEX. CIV. PRAC. & REM. CODE § 95.003. The plaintiff has the burden to prove these elements, and proving them is the plaintiff's "sole means of recovery" when Chapter 95 applies. *See Ineos*, 505 S.W.3d at 561 (quoting *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 51 (Tex. 2015)). The "actual knowledge" requirement in Section 95.003(2), as opposed to what the property owner should have known, makes it more difficult for a plaintiff to establish a property owner's liability under Chapter 95 than under the common law. *See Oiltanking Houston, L.P. v. Delgado*, 502 S.W.3d 202, 209 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Actual knowledge "requires knowledge that the dangerous condition existed at the time of the accident, as opposed to constructive knowledge[,] which can be established by facts or inferences that a dangerous condition could develop over time." *Ineos*, 505 S.W.3d at 568 (alteration in original) (quoting *City of Corsicana v. Stewart*, 249 S.W.3d 412, 414–15 (Tex. 2008) (per curiam)). Constructive knowledge is "what a reasonably prudent person should have known or should have foreseen." *Rawson v. Oxea Corp.*, 557 S.W.3d 17, 30 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd) (mem. op.). An owner is not liable based only on what he reasonably should have known. *Ineos*, 505 S.W.3d at 561.

Knowledge that a condition or activity is "potentially dangerous" is not sufficient to establish actual knowledge. *Oiltanking Houston*, 502 S.W.3d at 212.

15

When a property owner is only aware of a condition or activity that *could* lead to an injury, he does not have actual knowledge for the purpose of Section 95.003(2).

To distinguish knowledge of a potentially dangerous condition or activity from actual knowledge of the danger or condition resulting in injury, the plaintiff must show the property owner knows of the specific factors that caused[5] the injury. For instance, a court upheld a jury finding of actual knowledge when the property owner knew that gaskets on its site were made of asbestos, knew the causal relationship between asbestos and mesothelioma, and knew that work on the gaskets generated dust and "respirable fibers"—the plaintiff's work on the gaskets resulted in his development of mesothelioma. *Union Carbide Corp. v. Torres*, No. 13-10-00325-CV, 2019 WL 6905229, at *8–9 (Tex. App.—Corpus Christi–Edinburg Dec. 19, 2019, pet. denied) (mem. op.). In another case, the Fourteenth Court of Appeals upheld a jury finding of actual knowledge when the property owner knew that sluiceways, which are like drainage ditches, on the work site were uncovered on the day of the accident, knew that scalding water was overflowing and flooding the work site, and knew that the flooding obscured the open sluiceways—these factors

---

[5] Ultimately, we must look at the cause of the injury to determine whether the property owner owes a duty because Chapter 95 requires "actual knowledge of the danger or condition *resulting in*" the injury, *see* TEX. CIV. PRAC. & REM. CODE § 95.003(2) (emphasis added), but this is not the same inquiry as proximate cause in the broader negligence claim, *see Elephant Ins. Co.*, 644 S.W.3d at 144 (noting plaintiff must demonstrate defendant's breach proximately caused injury to establish negligence).

resulted in the plaintiff falling into an open sluiceway and being covered in scalding water up to his waist, suffering third-degree burns. *Pasadena Refin. Sys., Inc. v. McCraven*, Nos. 14-10-00837-CV & 14-10-00860-CV, 2012 WL 1693697, at \*6–7 (Tex. App.—Houston [14th Dist.] May 15, 2012, pet. dism'd) (mem. op.). These cases show that a property owner has actual knowledge of a danger or condition resulting in injury when he knows of the specific factors that cause the injury.

When a property owner only knows of general, potentially dangerous factors, however, as opposed to the specific factors that caused an injury, the property owner does not have actual knowledge for the purpose of Section 95.003(2). In *Ineos USA, LLC v. Elmgren*, the Texas Supreme Court rejected the plaintiff's contention that the petrochemical plant owner had actual knowledge of the danger or condition resulting in injury because it knew there was explosive gas present at the plant. 505 S.W.3d at 569. The Court explained that the presence of gas at the plant was not the "danger or condition resulting in" the injury to the plaintiff, who was injured when gas in the pipe on which he was working caused the pipe to explode. *Id.* (quoting TEX. CIV. PRAC. & REM. CODE § 95.003(2)). If the mere presence of flammable or explosive gasses at a petrochemical plant were a "danger or condition," the property owner would always have "actual knowledge" of the danger but would never "fail[] to adequately warn" because the injured worker would also always have that knowledge. *Id.* (alteration in original) (quoting TEX. CIV. PRAC. & REM. CODE

17

§ 95.003(2)). Instead, the Court concluded the danger or condition at issue was the presence of gas in the *specific* pipe on which the plaintiff was working, not the presence of gas at the plant generally. *Id.* The presence of explosive gas at the plant was a potentially dangerous condition, but the actual danger or condition resulting in injury was the presence of gas in the pipe on which the plaintiff was working, and there was no evidence the owner had knowledge of this. *See id.* The Court rejected the plaintiff's general definition of the danger or condition in favor of the specific factor that actually caused the injury. Knowledge of a generally or potentially dangerous condition or activity is insufficient.

Similarly, the property owner in *Oiltanking Houston, L.P. v. Delgado*, did not have actual knowledge of the danger or condition resulting in injury at an oil storage facility when flammable vapors inside a pipe the plaintiff was welding caused an explosion. 502 S.W.3d at 216–17. The owner knew the facility handled crude oil, that "elaborate safety precautions" were needed, and that the pipe at issue had previously transported crude oil, but this was only knowledge of a potentially dangerous condition. *Id.* at 217. The owner did not know there were flammable vapors inside the pipe the plaintiff was welding, which was the danger or condition that actually caused the injury. *See id.* In another case, the owner of a construction site did not have actual knowledge of the danger or condition resulting in injury even though the construction manager was at the site daily and likely saw that workers

18

had to "piece together flooring" from plywood scraps on the second story. *Alonso v. Westin Homes Corp.*, No. 14-15-00898-CV, 2016 WL 7234474, at \*3 (Tex. App.—Houston [14th Dist.] Dec. 13, 2016, no pet.) (mem. op.). At most this was knowledge of a potentially dangerous condition. *Id.* The owner did not have actual knowledge of the weak spot in the pieced-together floor, on which the plaintiff stepped that caused him to fall through to the first floor. *See id.* Knowledge of general, potentially dangerous conditions, like the general presence of flammable vapors or a patchwork flooring, is insufficient because these conditions alone did not cause the injuries in question.

### Standard of Review

Exxon contends there is legally insufficient evidence to support the jury's finding of actual knowledge.

When a party challenges the legal sufficiency of the evidence to support an adverse finding on which it did not have the burden of proof, the party must demonstrate that no evidence supports the finding. *E.g.*, *Nguyen v. Hoang*, 507 S.W.3d 360, 370 (Tex. App.—Houston [1st Dist.] 2016, no pet.). When determining whether the evidence is legally sufficient to support the challenged finding, we review the evidence in the light most favorable to the finding. *Id.* We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

19

Anything more than a scintilla of evidence is legally sufficient to support the challenged finding. *See id.* "More than a scintilla of evidence exists when the evidence as a whole rises to a level enabling reasonable and fair-minded people to have different conclusions." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014). "When a legal sufficiency point is sustained, the appellate court's duty is to reverse and render." *Thomas v. Am. Express Nat'l Bank*, No. 05-22-00024-CV, 2022 WL 17843546, at *1 (Tex. App.—Dallas Dec. 22, 2022, no pet.) (mem. op.); *see also Heritage Res., Inc. v. Hill*, 104 S.W.3d 612, 619 (Tex. App.—El Paso 2003, no pet.).

## Analysis

We start our analysis with Question 2 of the jury charge,[6] which asked:

> Did the negligence, if any, of ExxonMobil proximately cause the injury in question?
>
> With respect to the conduct of ExxonMobil, it was negligent if
>
> 1. Crane operations in the [152] yard posed an unreasonable risk of harm;
>
> 2. ExxonMobil had actual knowledge of the danger; and

---

[6] Question 1 of the jury charge addressed Section 95.003(1) of the Texas Civil Practice and Remedies Code, whether Exxon exercised or retained some control over the manner in which JVIC's work was performed. Question 2 addressed Section 95.003(2), whether Exxon had actual knowledge of the danger or condition resulting in the personal injury and failed to adequately warn.

Our disposition is based solely on the issue of actual knowledge under Section 95.003(2), so we do not need to reach the issues of whether Exxon exercised control under Section 95.003(1) or whether Exxon failed to warn under Section 95.003(2).

3. ExxonMobil failed to exercise ordinary care to protect Souders from the danger, by both failing to adequately warn Souders of the unreasonable risk of harm and failing to make crane operations in the [152] yard reasonably safe.[7]

The jury answered, "Yes."

Exxon asserts there is no evidence to support this finding because there is no evidence the crane operations in the 152 yard posed an unreasonable risk of harm and there is no evidence Exxon had actual knowledge of the danger or condition that resulted in Souders's injury. Instead, Exxon argues, the evidence shows the crew was experienced and could have performed the lift safely if Souders had not been in the exclusion zone when the lift began.[8]

---

[7]    This language was taken from Pattern Jury Charge 66.14, applicable to Chapter 95 claims. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Tex. Pattern Jury Charges: Malpractice, Premises & Products* PJC 66.14 (2022).

The charge uses the "unreasonable risk of harm" language often seen in premises liability cases. *E.g.*, *Zook v. Brookshire Grocery Co.*, 302 S.W.3d 452, 454–55 (Tex. App.—Dallas 2009, no pet.) (explaining that property owner owes invitees duty to exercise reasonable care to protect from dangerous condition of property that poses unreasonable risk of harm).

Chapter 95 does not use the phrase "unreasonable risk of harm." Souders submitted this jury question, based on the Chapter 95 pattern jury charge, and it was incorporated into the final jury charge. While Exxon objected to this question on several grounds, it did not object to that particular language. In any event, we need not reach Exxon's objections to this jury question or determine whether this was a proper instruction for a negligent-activity claim under Chapter 95 because of our disposition on the issue of Exxon's actual knowledge.

[8]    Exxon also argues there is no evidence that Exxon exercised or retained some control over the manner in which JVIC's work was performed under Section 95.003(1) of the Texas Civil Practice and Remedies Code. Exxon further argues it did not fail to adequately warn under Section 95.003(2) because the evidence

21

In response, Souders argues there are three categories of evidence from which the jury could find Exxon had actual knowledge that the crane operations in the 152 yard were unreasonably dangerous and that Exxon had actual knowledge of the danger resulting in Souders's injury: (1) Exxon knew its independent contractors were not adequately trained on Exxon's T1BP guidelines and worked in violation of those guidelines; (2) Exxon knew its supervisors were not adequately trained on Exxon's T1BP guidelines and could not ensure compliance with the guidelines; and (3) Exxon knew this particular lift was dangerous because it was a complex lift.

*T1BP*

We consider the first two categories together, the independent contractors' and Exxon supervisors' lack of training on T1BP.

Undisputedly, Exxon knew that not all of its independent contractors and supervisors had been trained on T1BP at the time of Souders's accident. Souders had received T1BP training, but the other members of his crew had not.

But there is no evidence that lack of T1BP training, for either the independent contractors or supervisors, was the "danger or condition resulting in" Souders's injury. *See* TEX. CIV. PRAC. & REM. CODE § 95.003(2). Souders was injured when

established Souders already knew of the alleged danger or condition resulting in injury, and thus Exxon had no duty to warn. But because we conclude that Exxon did not have actual knowledge of the alleged danger or condition, we do not need to address these other arguments.

22

the crane operator began lifting the load in the 152 yard while Souders was still in the exclusion zone, but he presented no evidence that lack of T1BP training was a specific factor allowing that to happen. *See Ineos*, 505 S.W.3d at 569.

At no point did Souders identify which part of T1BP, if it had been followed, would have prevented his injury. For instance, both Exxon's investigator and Souders's safety expert offered their opinion that if the crew had effectively managed the exclusion zones, appointed a lift director, or completed a lift plan, the accident would not have happened. T1BP requires each of these things, but so does MWP 9080, and each member of the crew had received MWP 9080 training. Even Souders's safety expert agreed that, given the crew's certifications and training, they should have known not to begin the lift before Souders was out of the exclusion zone. Souders—who had received T1BP training—admitted that, before taking the job at Exxon, he knew to avoid exclusion zones. Thus, although Exxon knew that not all of its independent contractors and supervisors had received T1BP training, Souders presented no evidence that this was the danger or condition resulting in his injury.

Additionally, there is no evidence that the lack of T1BP training was unreasonably dangerous. Exxon required independent contractor crane operators and riggers to have national certifications. Souders and his crew were certified to safely perform crane and rigging operations before Exxon chose to implement T1BP.

23

Exxon chose to implement this additional safety training, but there is no evidence that failure to implement this additional training created the danger that resulted in Souders's injury. T1BP overlapped with safety information the crew already knew, including other Exxon rules like MWP 9080. Souders did not present any evidence that T1BP training was necessary to perform lifts safely.

Even if the lack of T1BP training were unreasonably dangerous, this by itself would at most show Exxon had knowledge of a "potentially dangerous" condition or activity, but not actual knowledge as required. *See Delgado*, 502 S.W.3d at 212. Exxon knew that lack of familiarity with T1BP "could provide an opening for a serious incident," as indicated in Exxon's T1BP audit. But this general knowledge that a serious incident *could* occur is not actual knowledge. *See id.* Moreover, knowledge that a serious incident could occur at the facility in general is not evidence that Exxon had actual knowledge a serious incident could occur at the 152 yard, where Souder's injury occurred.

We agree with Exxon that there is no evidence Exxon had actual knowledge of the danger or condition resulting in Souders's injury or that crane operations in the 152 yard were unreasonably dangerous, even though Exxon knew not all independent contractors had received T1BP training and its supervisors were not adequately trained to ensure compliance with T1BP.

*Complex Lift*

We next consider Souders's third category, evidence that Exxon had actual knowledge this particular lift was dangerous because it was a complex lift.

Exxon's MWP 9080 defines a complex lift. Souders did not present any evidence that the lift in question met any of the criteria of a complex lift. Souders did not present any evidence that any Exxon employee knew on the night of the accident that the lift was a complex lift. Adams, Exxon's supervisor over the 152 yard, testified he did not know the crew was going to perform a lift that night, so he could not have known the lift might be complex. Adams was not present in the 152 yard on the night of Souders's accident. Laramore, Exxon's supervisor over the wash slab who generally discussed safety with Souders and his crew, admitted he had no familiarity with crane and rigging operations or MWP 9080. He did not testify that he knew what a complex lift was or that the lift that night was complex. Each Exxon representative who testified agreed this was a basic lift that did not require Exxon supervision per MWP 9080.

Still, Perkin, Souders's safety expert, testified that the lift was complex because of its difficulty.

Even assuming this was a complex lift and not a basic lift, there is no evidence the complexity of the lift was the "danger or condition resulting in" Souders's injury. *See* TEX. CIV. PRAC. & REM. CODE § 95.003(2). There is no evidence the complexity

25

or difficulty of the lift contributed to the crane operator beginning to lift the load while Souders was still in the exclusion zone. Nor is there any evidence that this contributed to the crew's failing to effectively manage the exclusion zones, appoint a lift director, or complete a lift plan (assuming the crew did not complete a lift plan).

There was also no evidence that a complex lift itself is unreasonably dangerous. Exxon's MWP 9080 describes safety guidelines for performing complex lifts safely, and each member of the crew was trained on MWP 9080, in addition to the training they received as part of their national certifications. There was no evidence that this lift, as opposed to any other lift the crew performed, was unreasonably dangerous just because it was complex, assuming it was complex. The crew safely performed a lift of a heat exchanger bundle in the wash slab earlier that night.

Souders argues that Exxon determined the timing, staging, location, and equipment for this lift and ordered it to be performed in a tight space with inadequate lighting, and the jury could conclude from this evidence that Exxon knew this lift was unreasonably dangerous. Exxon only provided general instructions for the kinds of tasks it needed done for the turnaround in a schedule, but Souders and his crew received instructions about specific tasks from JVIC. Exxon did not stage the bundles or space them two feet apart; the JVIC crew did that. Exxon allocated the 152 yard for staging the bundles, but there is no evidence Exxon knew this space

26

was inadequate or that the bundles were staged two feet apart. Perkin testified the lighting in the 152 yard was inadequate, but there is no evidence Exxon knew this or that lighting contributed to the accident. Souders was standing behind a bundle when the lift began, so the crane operator could not have seen him, regardless of lighting. Even if there were evidence that Exxon determined the timing, staging, location, and equipment for this lift and ordered it to be performed in a tight space with inadequate lighting, there is no evidence any of these factors contributed to the crane operator beginning to lift the load while Souders was still in the exclusion zone.

We agree with Exxon that, even assuming this was a complex lift, there is no evidence this lift posed an unreasonable risk of harm, that Exxon had actual knowledge of that risk, or that the lift being complex was the danger or condition that resulted in Souders's injury.

\* \* \*

Because there is no evidence Exxon had actual knowledge of the alleged danger or condition resulting in Souders's injury, Souders did not meet his burden under Section 95.003. *See* TEX. CIV. PRAC. & REM. CODE § 95.003; *Ineos*, 505 S.W.3d at 561. Therefore, Exxon owed no duty and is not liable to Souders under Chapter 95. The trial court erred in rendering judgment in favor of Souders. We

27

sustain Exxon's first issue. We need not decide Exxon's or Souders's remaining issues on appeal. *See* TEX. R. APP. P. 47.1.

## CONCLUSION

Because Exxon is not liable under Chapter 95 of the Texas Civil Practice and Remedies Code, we reverse the trial court's judgment and render a take-nothing judgment in favor of Exxon.


Gordon Goodman
Justice

Panel consists of Justices Kelly, Goodman, and Rivas-Molloy.

Kelly, J., concurring.